## HASBROUCK VS. THE CITY OF MILWAUKEE.

21 217
78 651

CONTRACT WITH MUNICIPAL CORPORATION: *Legislative ratification of contract in excess of power.—City bound and estopped by acts of officers with knowledge of council, and without objection.*—CHARGE *to jury, what constitutes.*

1. By the charter of a city and by the law authorizing it to construct a harbor and issue bonds therefor to the amount of $50,000, the common council were required to cause accurate plans, &c., of said harbor to be filed, and to let the contract to the lowest bidder, after public notice. The contract, as let, provided that the harbor should be constructed in accordance with the plans and specifications on file, subject to any alterations which the city might direct, the extra expense of which was to be paid by the city. Afterwards, in 1855, the city agreed with B., the assignee of the first contractor, to pay him $59,000 in bonds—less the amount already paid—for completing the work, still reserving the right to make alterations in the plan. Soon after, in the same year, the council adopted another plan much more expensive than the former, and such that the original plan could not be followed as a guide "even to the extent of the amount of labor and materials contemplated and estimated as sufficient for the construction of said harbor" upon that plan. In 1856 the legislature amended the act authorizing the construction of the harbor, so as to increase the amount of bonds which might be issued under said act to $100,000. In February, 1857, authority was given to issue such an amount of bonds as might be necessary to complete the harbor. Both these amendatory acts were procured, or approved and acted upon, by the city. In an action by the contractor for a balance alleged to be due him for the construction of said harbor, *Held*, that said acts of 1856 and 1857, must be construed as a ratification of the action

of the common council in changing the plan and in making the contract for the subsequent construction for an amount exceeding the authority it then possessed, and without letting it to the lowest bidder.

2. After the change of plan, the city engineer, whose business it was under the contract to estimate the work done and materials furnished, estimated each item at its cash value, without attempting to distinguish what should be referred to the old plan, and what, relatively to that, was extra work; and these estimates were made under the special instructions of the harbor committee of the council, with full knowledge by the council of the method pursued, and without objection. *Held*, that the plaintiff could not be required to show in this action what part of the work and materials was extra work; but might recover the actual value of the whole.

3. Upon the evidence in this action (*vide infra*), the question was properly submitted to the jury, whether there was an agreement or understanding between the plaintiff and the defendant, that the former should receive city bonds in payment only at their market value, and not at par as provided in the original contract.

4. Plaintiff, while engaged upon the harbor, built, under the direction of the city engineer and harbor committee, a "protection work," to facilitate the construction of the main work. Said engineer and committee being empowered to oversee and direct in regard to the best manner of executing the contract, the city was liable for the cost of such "protection work."

5. Whatever the court may say to the jury in regard to the principles of law applicable to the case, or in regard to the evidence, is a part of the charge, and must be reduced to writing at the request of either party.

5. But mere general remarks on other subjects (as in regard to the length of the trial, in apology for the judge's impatience during its progress, &c.,) are no part of the charge.

APPEAL from the Circuit Court for *Racine* County.

The facts and pleadings in this case are so fully stated in 13 Wis., 37–56, and 17 id., 266–83, that they will not be repeated here. This court having decided (17 Wis., 266, 281) that the question as to the gross value of the extra work done and materials furnished by reason of the change in the plan of the harbor, should have been submitted to the jury upon evidence furnished by the parties as to the real value of such work and materials, and that the parties were not bound by the engineer's estimates in that respect, the complaint was afterwards amended so as to allege that the total value of the labor and materials furnished by the plaintiff was $206,086, and that

there was still due him $102,379, with interest. The complaint also avers that the acts of the legislature, approved March 18, 1856, and February 23d, 1857, relative to the issue of the bonds by the city for such harbor (13 Wis., 38), were procured by the city in view of the enhanced expense of the harbor occasioned by the modification of the Hawley contract; and that the city had subsequently approved and acted upon them in issuing bonds to the plaintiff under them, &c. The answer admits that the city had "approved and acted upon" the act of 1857, but denies the remainder of said averment. In other respects the pleadings are substantially as stated in 17 Wis., 268–9. There is no averment that the plaintiff ever demanded bonds of the city in payment of that or any other sum, but it is alleged that "defendant has neglected and refused to pay to the plaintiff the balance due to him as aforesaid, * * and still does neglect and refuse." The evidence (received against defendant's objection) showed a demand for "a settlement," and "payment of the balance of account" in plaintiff's favor, made first of the chairman of the harbor committee, and subsequently of the whole committee.

There was voluminous evidence on both sides as to the value of the labor and materials furnished by plaintiff. As to the *mode of payment*, the plaintiff testified, under objection: "There was an understanding between me and Mr. Hadley, chairman of the harbor committee, that the bonds [of the city] were to be taken at their cash value. That related to all bonds received by Barton and myself. This was in several conversations between me and Hadley and Cross, the mayor of the city. It was understood and settled by the harbor committee." On cross-examination; "I first spoke to Hadley about the mode of payment in May, 1856, before I commenced work; don't know that any one was present. It was then understood and agreed between Hadley and me, that the bonds were to be taken at their cash value. The next time the subject arose,

was on the delivery of the first bonds to me. The mayor and Hadley, and perhaps Edwards, the comptroller, were present. Hadley and the mayor both then asked me to get the highest price for the bonds. I next had a conversation about it with Hadley alone, about the time the contract was completed and I was seeking a settlement. I called his attention to the former conversation, and told him I hoped there would be no difficulty in arranging the matter before the committee. Afterwards I went before the harbor committee. The question was mooted there. Kuehn, Hadley, Mallory, Reed, Wergin, McCormick and Loeffler were present. Jonathan Taylor, a member of the committee, was not present. Hadley called attention to it, showed the estimates,  *  *  and said that they had been made at cash prices, and I was to have the bonds at cash value or an equivalent to cash. It was so determined at that meeting of the committee." The joint report of the harbor and finance committees to the common council, made January 25, 1858, was put in evidence, under defendant's objection. See 17 Wis., 270–71. Mr. Hadley, for the plaintiff, testified that after the change in the plan of the harbor, there was a change in the mode of estimating the work; that the estimates were then made by the city engineer upon a cash basis, by direction of the harbor committee; and the reason was, because the change of plan was so great that the old plan could not be followed in making the estimates. *Question :* "Was there any understanding or agreement between the harbor committee and the plaintiff, or Barton, as to whether these bonds should be received by them at their cash or nominal value, and if so, what was it?" *Answer :* "There was no specific bargain about it. The change of plan was directed by the city council, by resolution, in August, 1855. Barton was then directed to do the work as stated in the resolution. The first pay he received after this was $8,000 in bonds, in September or October, 1855. He objected to receiving them at their face, but said he would

receive them and account for them at their cash value, and made a written protest, which was reported to the common council at the time. There was no agreement or understanding about the payment." *Question:* "Was it not the mutual understanding between the plaintiff and the harbor committee, during the time the payments of the bonds were made, that he received them at their cash value?" *Answer:* "There was no such bargain made about it. The committee had no authority to make any such bargain. *Hasbrouck* always claimed that he should receive the bonds at their cash value. He always claimed that he should be allowed the benefit of Barton's protest. We had directed that the estimates should be made upon a cash basis. As to the rate at which the bonds were to be taken, the committee did not seek to have any arrangement or uuderstanding with *Hasbrouck.* I did not assure him that he should have the bonds at their cash value. He is mistaken about it. I told him I thought the council would take the fact that the estimates were upon a cash basis into consideration, and do him justice. I always told him (what I understood to be the judgment of the committee) that we would report to the council the fact that the estimates were made upon a cash basis, and would use our influence to have the council do him justice. I had no more charge than any other member of the committee. I was chairman and made the report. * * I think the plaintiff received every payment in bonds on the supposition that he received them at their cash value; he always claimed that he would not receive them in any other way. We left it to the common council to do what they pleased. * * I always supposed he was receiving the bonds under the benefit of the Barton protest; I know he understood it so." *Question:* "At any time when plaintiff received bonds, saying that he would receive them at their cash value, was any objection made by any member of the harbor committee?" *Answer:* "Not to my knowledge. * * The facts that the engineer

made his estimates on a cash basis, that Barton protested against receiving the bonds at par, and that *Hasbrouck* claimed the same thing as Barton, were made known to the common council, and no objection was made, to my knowledge, by any member of the council." The engineer's estimate, dated September, 8, 1855, with Barton's "protest" thereon, was then put in evidence. See 17 Wis., 269. D. C. Reed, for the plaintiff, testified that he was a member of the common council and of the harbor committee for the last seven or eight months of 1857; that he knew of plaintiff having bonds, but never saw any delivered to him; supposed he was receiving them at their cash value; was opposed to the harbor, and made many inquiries about it; learned from Trowbridge, the engineer, and members of the committee, that estimates were made at cash prices, and understood he received the bonds at their cash value; acted on that supposition in his official conduct. James B. Cross testified that he was mayor of Milwaukee from the spring of 1855 to the spring of 1858; had no recollection of having any conversation with the plaintiff during that time on the subject of payments, or that plaintiff ever said anything to him about it when he received bonds. After the work was done, and when asking for pay, he understood that plaintiff claimed that the bonds he had received should be accounted for at their cash value, and he (witness) thought it no more than equitable. On cross-examination he said: " I never delivered any bonds to plaintiff to be credited on his contract at their cash value. * * No one was authorized by the council, to my knowledge, to change the mode of payment from that stipulated in the contract. * * When I gave *Hasbrouck* bonds, there was no understanding at all that they should be taken at their market value. I don't remember asking plaintiff, at the time of making the first payment, to get the best price he could for the bonds. I was selling bonds for the city myself at the time, and was desirous to keep up the price, and may have

made the request, but don't recollect." Jasper Humphrey testified that he was a member of the common council of Milwaukee in 1856, and until May, 1857 ; that he then understood that the bonds received by plaintiff were delivered to him at their cash value, and acted upon that understanding as a member of the harbor committee, in behalf of the city, in reference to this contract. On cross-examination he said : "This understanding was an impression ; it was talked over in the committee ; I got it from the chairman of the committee, and from Conroe [plaintiff's partner]. I do not mean to say that the committee or the common council ever made any agreement with the plaintiff to change the mode of payment, or that the common council authorized such change. My impression has, in a great measure, arisen from the fact that the engineer was instructed to make his estimates on a cash basis." Mr. Conroe testified : "I had conversations with Hadley, chairman of committee, and Trowbridge, city engineer, about the mode of payment. It was in the winter of 1856, when they were trying to induce me to take the contract. At that time I was solicited by different persons in Milwaukee to take up the contract and complete the harbor—by Mr. Hadley among others. He told me that the council had passed a resolution instructing the engineer to estimate the work at cash prices, and said that it would be so paid. That is the substance of the conversation. I went from him to the engineer. He told me that he had been so instructed, and was doing so ; he repeatedly told me that he could not estimate in any other way ; that he could not keep track of the price of bonds, so as to make estimates in bonds. Hadley and Mallory of the harbor committee both told me there was no other way to do the work, except to estimate it at cash prices, and pay for it accordingly." On cross-examination he said that neither plaintiff nor he examined the records of the common council to see what action had been had by the city, but they relied on what Mr. Hadley and the

engineer had told them ; was not certain that Hadley said the common council had directed the estimates to be made for cash, but so understood ; he might have said that the harbor committee had so directed.—The other evidence for the plaintiff on this point was similar in substance to that above stated. All this evidence was received against defendant's objection.

The defendant moved for a nonsuit, on the following grounds: 1. No allegation or proof that plaintiff, since the completion of the work, had ever demanded bonds of the city for the amount claimed to be due, or for any amount. 2. Original contract not let to the lowest bidder. 3. City not authorized, prior to the act of February 23d, 1857, to expend more than $100,000 on the harbor, and that sum fully paid before the commencement of this action. 4. No letting of contract to lowest bidder after change of plan, nor any letting under the act of 1857. 5. Failure of evidence to support the complaint.—Motion denied.

For the defendant, four members of the common council of said city, and of the harbor committee in 1856 and 1857, testified as follows : The first said, "I know of no agreement to pay *Hasbrouck* in bonds at cash prices. I know of no member of the committee having any authority to change the contract as to the mode of payment, or to direct any estimates to be made at cash rates, or to direct any change in the form of the estimates." The second: "There was no change in the mode of payment made with *Hasbrouck*." The third: "I know of no agreement or understanding to change the mode of payment to the plaintiff. The harbor committee did not, to my knowlege, attempt to make any such change, nor did it authorize any member of the committee to make it." Another said, "I was a member of the harbor committee, and was present when the change of the plan of construction was agreed upon. Hadley, chairman of the committee, Edwards, city comptroller, and the plaintiff, were present. It was then said

that the change of plan would make considerable additional work, and my understanding was, that the plaintiff was to be paid for such additional work at the same rate and in the same manner as he was on the original contract. * * I had a conversation with the plaintiff in 1857, about the time the contract was let to him for the construction of the fourth section of the harbor, in which he insisted that he ought to have cash for the construction of said fourth section, because he received bonds for the construction of the first three sections [for balance due on which this suit is brought. REP.] ; and said bondshad greatly depreciated in value since he took the contract for those sections." *Hasbrouck*, being recalled in his own behalf, testified that no such conversation ever occurred as that just stated. The remainder of the evidence need not here be stated.

The defendant having requested that the court should reduce its charge to writing, and the respective counsel having presented written instructions which they requested to have given to the jury, the judge addressed the jury orally as follows : " The only instructions I shall give you in this cause are in writing, which I shall read to you ; being the three instructions reduced to writing and requested by the plaintiff's counsel, and two of the instructions reduced to writing by the defendant's counsel, one of which I have changed in writing, and shall read to you as it is written. Before reading the instructions to you, I desire to say that the trial has been a long and tedious one, occupying one day longer in taking the evidence than any case which has been tried in this circuit for seven years. During the long and fatiguing trial, the court may have become impatient at the delay of the counsel, and made remarks that may possibly have influenced some juror. I wish it especially understood that nothing I have said was intended to influence unduly the verdict of the jury, and I do not wish any juror to be influenced by it in the least. In submitting this case to you, I will not comment at all upon the evidence

which has been introduced, leaving you to weigh it all in your own judgment, and bring in your verdict accordingly." Thereupon, " addressing himself to the defendant's counsel and not to the jury, but in the hearing of the jury," the judge said orally : " Of the thirty-four instructions handed me by you, I mark all except the 26th and 34th· refused, because they assume a state of facts which, whether or not it existed, I cannot assume. The vital points of them are also contained in the three instructions submitted by the plaintiff, which I shall presently read to the jury." He then read to the jury the following written instructions presented by plaintiff's counsel : "1. If the plaintiff, under the contract assigned to him, and under the direction and superintendence of the harbor committee, performed his contract to the satisfaction and acceptance of said engineer and said committee, then you will return a verdict for him for the actual value of the labor done and materials furnished in completing said contract (including the materials that went into the protection work, if you find that it was constructed by the direction and under the supervision of said engineer and committee), crediting the bonds at par ; with interest thereon since the completion of the contract and demand of payment, if such demand was made before the commencement of this suit, and if not, then interest from the commencement of this action. 2. If you find for the plaintiff under the first instruction, then you will determine whether any understanding or agreement existed between the plaintiff and defendant before the plaintiff commenced work under said contract, that plaintiff should be paid in city bonds at their market value, and not at par ; and if any such existed, then you may find by a special verdict the amount which plaintiff is entitled to under said contract or understanding ; i. e., the difference between the par and actual values of the bonds received by plaintiff, at the time they were. received, with interest thereon from demand, if there was such a demand; other-

wise, from the commencement of this action. 3. If such an understanding or agreement as is mentioned in the second instruction existed betwen the plaintiff and harbor committee, pretending to act for the common council, before plaintiff entered upon the completion of said contract, and if this fact was well known to the common council before plaintiff entered upon the performance of said contract, and if said council knew that plaintiff was performing said contract in consequence and upon the faith of such agreement or understanding, and if said council, so knowing, made no objection to such agreement or understanding, and knowingly and without objection permitted the plaintiff to complete the work under said contract, in the expectation of having said agreement or understanding between him and said harbor committee carried out by the defendant, this amounts to such an agreement or understanding between the plaintiff and the defendant as is mentioned in the second instruction." The court then gave the following instruction asked by defendant: " 26. If you should find that it was the understanding of certain members of the harbor committee, in 1856 and 1857, during the progress of the work, and while payments in bonds were being made, that such bonds were to be received and accounted for by the plaintiff at their market value and not at par, this fact would not establish a valid agreement the part of the city for such a change in the mode of payment." The defendant asked the following: " 34. If the jury find that any sums of interest had accrued upon the bonds of the city, or any of them, received by the plaintiff on account of work done under the contract for the construction of the harbor, prior to the times of their payment to the plaintiff, such amounts of accrued interest are to be added to the amount *for which the defendant is entitled to credit.*" The court gave this, modified by substituting for the words in italics the following: " of the face of the bonds; the whole sum then to be disposed of by the jury as they think right under the evi-

dence." The court refused instructions asked by defendant, which were in substance as follows : That if plaintiff had any unsatisfied claim against the city, by reason of the facts set forth in the complaint, it was payable in city bonds, and plaintiff could not recover in this action for want of any allegation in the complaint of demand and refusal of such bonds ; that the contracts with Hawley and Barton, so far as they attempt to bind the city for the payment of an amount exceeding $50,000, were void, because the city was not then authorized by law to make itself liable for a greater sum for the construction of said harbor, and because the contract with Barton was not let to the lowest bidder after notice ; that if the city, prior to February 23, 1857, had paid bonds for the construction of said harbor to an amount exceeding $100,000, it had no further power to render itself liable for that work, except such as was granted by the act of February 23, 1857, and that act did not authorize the payment of additional bonds for any labor or materials furnished before its passage, but only for such as should thereafter be furnished in completing the harbor ; that plaintiff could not recover for labor and materials furnished by him after said February 23, 1857, because they were not furnished upon a contract therefor duly let to him as the lowest bidder, as required by the city charter; that if the city was liable at all for labor and materials furnished by plaintiff in 1857, it was only liable for their value at prices not exceeding those stated in the complaint after deducting the amount of the bonds paid plaintiff since the passage and under the authority of said act of February 23d, 1857 ; that if the value per yard of the dredging between the harbor piers was not increased by the change of plan, then for the amount of such dredging required by both plans, plaintiff could claim payment only in accordance with the Hawley contract, i. e., he could only claim such portion of the whole contract price ($48,900) as the value of such dredging bore to the value

of the whole work, and it was for plaintiff to show what that proportion was; that so far as the jury could trace the work and materials provided for in the Hawley contract in the work and materials for which the suit was brought, they should be governed by the amount agreed to be paid Hawley by that contract; that so far as the materials and work required by the "city plan" were the same as those required by the "government plan," the plaintiff was bound by the stipulations of the Hawley and Barton contracts as to price, and was not entitled to compensation beyond the sum limited in those contracts, except for *extra* work and materials required by the change of plan, and was bound to allege and prove their amount, kind and value; that by reason of a failure to allege and prove these, he could not recover for such extra work and materials; that any pretended contract for the construction of said harbor made after that with Hawley, was invalid because not ratified by a vote of the inhabitants of said city; that if, after the execution and delivery of the Hawley contract, alterations in the plan of the work were made by the city, pursuant to the provisions of said contract, which materially increased the expense, and if the person or persons appointed by the city to see to said work and direct in relation thereto, could not agree with the plaintiff as to the value of such extra work and materials, and the same had not been fixed by three disinterested persons in the manner provided in the contract, then the plaintiff could not recover in this action for such extra work, unless the city had refused to select an arbitrator on its part pursuant to the terms of said contract; that plaintiff was not entitled to payment in bonds at any other than their par value, unless there was a special and valid contract with the city subsequent to the written contract with Barton, to receive them at such other value; that the city could be bound by the acts of its agents only when those acts were authorized by law, or by resolution, rule or ordinance of the common council,

and that plaintiff could not recover for work done in constructing the "protection work," nor for materials used therein, &c. Some other instructions were asked by defendant, and refused, which need not be here stated.

The defendant excepted to the three instructions first given, and to the refusal of the court to give the several instructions asked by it, and to the alteration made in one of the two given at its request, and also "to the remarks made by said judge to the jury." The judge then said in the presence and hearing of the jury: "I have given no instruction whatever to the jury except the five written instructions which I have read, and they are so expressly informed and charged, and cannot misunderstand me."

The jury found for the plaintiff, and assessed his damages— estimating at their par value the bonds received by him—at $106,224. They also found that before he entered upon the completion of the contract set out in the pleadings, it was understood and agreed by and between him and defendant, that he should receive said city bonds only at their market value; and that the difference between the par and market values of the bonds so received was $22,400; that the plaintiff made demand of payment January 1, 1858, and that the interest on the last mentioned sum was $12,283, making the total damages for discount on the bonds, $34,683.—Motion for new trial denied; and judgment in favor of plaintiff for $140,907; from which defendant appealed.

*Jas. G. Jenkins*, city attorney (with whom were *H. L. Palmer* and *J. Stark*, of counsel), for appellant, argued, among other things, that the Hawley contract did not authorize the city to set aside the old and substitute a new plan for the harbor; and that if it did, it was so far void. *Bonesteel v. Mayor of N. Y.*, 6 Bosw., 550, and 22 N. Y., 162; *Kneeland v. City of Milwaukee*, 18 Wis., 411; *Wells v. Burnham*, 20 id., 112; *Kneeland v. Furlong*, id., 437. 2. The agreement with Barton for $59,000

was void for want of power in the city to incur the increased liability. The substituted plan also involved an expenditure three or four times greater than the city was authorized to make. 13 Wis., 37, 54. 3. The contract for the construction of the harbor on the government plan was also void because not let to the lowest bidder after notice, as required not only by the harbor act of 1853, but by the city charter. *Mitchell v. Milwaukee*, 18 Wis., 92; *Brady v. Mayor of N. Y.*, 2 Bosw., 173, and 20 N. Y., 312; *McSpedon v. Mayor of N. Y.*, 20 How. Pr. R., 395; *Wolcott v. Lawrence Co.*, 26 Mo., 272; *Kneeland v. Milwaukee, Kneeland v. Furlong*, and *Wells v. Burnham*, *supra*. 4. The act of February 23d, 1857, was not an act of affirmance or ratification. The harbor was unfinished. A fourth section must be built; and the first three sections were not completed. The power of the city was exhausted. Legislation was necessary to enable it to procure to be done what was essential to the completion of the harbor. This the act of 1857 contained; and it neither expressed nor implied anything more. It conferred authority to issue bonds, not however to pay for work already done, nor to meet imperfect obligations upon a void contract, but simply to complete the harbor. There being then no valid contract in existence for the completion of the harbor, the city could not, under that act, lawfully procure the work of completion to be done without letting it by contract to the lowest bidder. 5. Under the Hawley contract, only the "extra work" occasioned by alterations of the plan was to be paid for at its value. A comparison of the two plans plainly shows that a portion of the work and materials was the same under both. The testimony of both parties proved the same thing. It was necessary for the plaintiff, suing upon the contract, to specify, in his complaint and proof, the extra work and materials, and their value. And the court erred in permitting him to prove and recover the value of all the work and materials, without reference to the prices

limited in the Hawley and Barton contracts.   6. The city engineer and harbor committee had no power to direct the construction of the protection work, and make the city liable therefor.   7. Plaintiff should have alleged and proven a demand of the bonds claimed to be due, or a failure to deliver them, and should have sought to recover their value as damages.   4 Chand., 159; 5 Wis., 400; 7 S. & R., 246; 1 Fost., 336; 12 N. H., 390; 2 Mumford (Va.), 344.   8. The court erred in addressing the jury orally, while charging them, in reference to the case and the trial thereof, and particularly in reference to the manner in which it had been conducted.

*Emmons & Van Dyke*, for respondent:

1. The complaint alleges an agreement to pay an equivalent to cash, i. e., bonds at their cash value.   When the city refused to pay, ours became a cash demand.   *Durkee v. Stringham*, 8 Wis., 1.   2. The objections to the power of the city to issue bonds for the work which is the subject of the action, are all disposed of by the former adjudications in this cause.   3. The question whether there was an agreement or understanding that plaintiff was to receive the bonds at their cash value only, was properly submitted to the jury on the evidence. Corporations may become bound and estopped otherwise than under the corporate seal; and their undertakings and admissions may be evidenced otherwise than by records, resolutions, by-laws, ordinances or other written documents.   They may promise by parol, and by mere implication, and are subject to all the presumptions which the law would raise against an actual person.   A. & A. on Corp. (ed. of 1855), §§ 238, 240, 252; *Burgess v. Pue*, 2 Gill, 11; *Bank of U. S. v. Dandridge*, 12 Wheat., 64; *King v. Amery*, 1 Term, 575; *Newling v. Francis*, 3 id., 198; *Union Bank of Md. v. Ridgely*, 1 Harris & Gill, 324; *Att'y Gen'l v. Middleton*, 2 Ves. Sr., 328; *Middlesex Husbandmen v. Davis*, 3 Met., 133; *Dedham Bank v. Chickering*, 3 Pick., 335; *Apthorp v. North*, 14 Mass., 167; *Amherst Bank v.*

*Root,* 2 Met., 534; *Selma & Tenn. R. Co. v. Tipton,* 5 Ala., 508 (787); *Hampshire v. Franklin,* 16 Mass., 76–90. Those cases which hold that corporations are liable upon implied assumpsit, as for use and occupation and the like, also illustrate the rule. *Dean &c. of Rochester v. Pierce,* 1 Campb., 466; *Doe v. Woodman,* 8 East, 228; A. & A. on Corp., § 238; and cases cited by STORY, J., in *Bank of U. S. v. Dandridge.* The city then might change the "mode of payment" in the same way that a natural person might, or the fact of its having done so might be proven by the same evidence as would prevail between individuals. Counsel then reviewed the evidence on that point, and contended that it was sufficient to support the finding of the jury. 4. If the court had already given the jury full and correct instructions on that point, it was no error to refuse the exact instructions drawn by the defendant's counsel, even though they were correct. *Hall v. Hall,* 6 Gill & J., 386–404; *Selin v. Snyder,* 11 S. & R., 319–23; *Lilly v. Paschal,* 2 id., 394–97; *Carothers v. Dunning,* 3 id., 373–78; *Lyman v. Redman,* 10 Shep., 289–96; *Ellis v. Com. Bk.,* 7 How. (Miss.), 294–301; *Bland v. People,* 3 Scam., 364; *Clark v. Fox,* 9 Dana, 193; *Gentry v. Bargis,* 6 Blackf., 261; *Lynch v. Welsh,* 3 Barr, 294.

*Mat. H. Carpenter,* on the same side, to the point that the original contract might be varied by parol as to the time or manner of its execution on the part of either party, and that after performance of the contract as thus modified, the party performing could recover in assumpsit, cited *Lehigh Coal Co. v. Harlan,* 27 Pa. St., 429; *Langworthy v. Smith,* 2 Wend., 588; *Proprietors &c. v. Hovey,* 21 Pick., 417; *Vicary v. Moore,* 2 Watts, 451; 2 Smith's L. C., 9, and cases there cited; *Goss v. Ld. Nugent,* 5 B. & Ad., 65; *Keating v. Price,* 1 Johns. Cas., 22; *Cummings v. Arnold,* 3 Met., 486; *Irwin v. Saunders,* 1 Cow., 239; *Blood v. Enos,* 12 Vt., 625; *Robinson v. Batchelder,* 4 N. H., 40; *Munroe v. Perkins,* 9 Pick., 298; 17 Wis., 282.

The making or modification of a contract is often a matter of inference from the *conduct* of the parties (*Blood v. Enos*, 12 Vt. 629); and "whatever is expected by one party to a contract, and known to be so expected by the other, is to be deemed a part or condition of the contract." *Jordon v. Dyer*, 34 Vt., 104. Whether the contract was so modified in this case, was a question of fact properly submitted to the jury.

COLE, J. After what has been said in this case on former appeals, as reported in 13 Wis., 38, and 17 id., 266, we do not deem it necessary to notice in detail the numerous exceptions which appear upon the record. For many of these exceptions relate to points which were previously discussed; and if not expressly, they have been at least impliedly overruled in the opinions already delivered. An able argument has been presented by the counsel for the city, for the purpose of showing that the contract for constructing the harbor according to the government plan must be held void, because the work and materials were not proposed for, or let to the lowest bidder, after public notice, as required by the act of April 1, 1863, and the general provision of the city charter bearing upon the subject; and likewise to show that the contract is invalid upon other grounds. Substantially the same objection has been heretofore taken to the contract. But it has always appeared to us that a conclusive answer to this argument is derived from the acts of the legislature, approved March 18, 1856, and February 23, 1857. These acts were passed after the modification of the Hawley contract by adopting the government plan, and in view of the greatly increased expense occasioned by the adoption of this plan; and must be construed, as we think, in the nature of a legislative ratification of the proceedings of the common council in changing the plan and making the contract in the manner it was made. It is true, there is nothing said in either of these acts about ratifying any proceedings of the

common council or confirming any contract. The first act authorized the mayor and common council to increase the amount of bonds they had been theretofore empowered to issue for the purpose of constructing the harbor, to one hundred thousand dollars ; while the other act empowered them to issue such an amount of bonds as might be necessary to complete the improvement. But, as already observed, these acts were passed after the modification of the original contract, and it is reasonable to assume that the legislature intended they should apply to the contract as modified, and enable the common council to carry it out on the part of the city. This, we think, is fairly inferrible from the necessity and object of these acts. Hence, when the case was first here, the chief justice in effect said, that if it had appeared that the city, by some authorized action, had procured the passage of the act of 1857, or had subsequently acquiesced in it by ratifying the contract, there would be little difficulty in the way of holding that the city was bound by the terms of such contract. If this view of the case be correct, then it is very evident that the reasoning advanced and authorities cited to show that the contract for completing the harbor on the government plan was void because the work was not let to the lowest bidder, or because the substituted plan required a larger expenditure than the common council was at first authorized to make, or for any other reason, are wholly inapplicable. For if the common council, in making the contract for the construction of the harbor on the government plan, exceeded their authority in any particular, the legislature has seen fit to confirm their action. It has given validity to what was before irregular and void. That this was the intention of the legislature in passing those laws—that the legislation was designed to apply to past transactions and to the existing contract—we have no doubt. This is all we deem it necessary to say in reply to the very full and able argument of counsel upon this point.

Another objection relied upon is, that the plaintiff was bound to state in his complaint, and show by proof, what amount of work was done and what materials were furnished under the original contract, as well as what was the value of the extra work and materials, so that the jury could readily determine the value of the extra work as contradistinguished from that included in the original contract and covered by the con- tract price. The complaint alleges that the change in the plan was a material and substantial change, which greatly en- hanced the cost and expense of constructing the harbor; so much so that the original plan could not be followed as a guide even to the extent of the amount of work, labor and materi- als contemplated and estimated as sufficient for the completion of the harbor on such original plan. Mr. Hadley, chairman of the harbor committee, states in his testimony, that the rea- son why the city engineer was directed to make his estimates on a cash basis after the adoption of the government plan was, because the change was so great that the old plan could not be followed in making the estimates. All the evidence shows most conclusively, that the change from the city plan to the government plan was quite radical. No attempt was made by the city engineer to distinguish in his estimates what, if any- thing, should be referred to the old contract, and what was ex- tra work proper. And yet the city engineer, in making his estimates, acted under the special instructions of the harbor committee ; and the common council were fully apprised of the method he was pursuing. But as no objection was ever taken to this mode of making the estimates, the remark of the counsel for the respondent seems to be fully warranted by all the evidence, that the idea of attempting to estimate the extra expense occasioned by the change was totally abandoned when the change in plan took place. After the change of plan, there would not seem to be any inherent difficulty in making estimates under the old contract for some of the work done by

the plaintiff under the government plan, as for instance, the amount of dredging between the piers required by both plans, the value per cord of stone, &c. Still it was perfectly competent for the parties to abandon the old contract altogether, even as a basis for making estimates for these things. And after having done this, at least after directing the city engineer to disregard the old contract in making estimates, it does not lie in the mouth of the defendant to object that the plaintiff must show what work and materials were embraced in the original contract, and what was extra work, in order to recover.

A further objection is, that the plaintiff could not recover for the expense of constructing the protection work so called. That work was built under the direction of the city engineer and harbor committee, and seems to have been necessary to the economical building of the harbor. Indeed, the city engineer so states in his testimony. It is said that the city engineer and harbor committee had no power to direct or make the city liable for any such work. We think otherwise. It appears to us that it was strictly within the scope of the authority of the harbor committee and city engineer, to oversee and direct as to the best manner of executing the contract; and every principle of equity and justice requires that the city should pay what the protection work was reasonably worth.

The question whether, after the change of plan, the work proceeded upon a cash basis and upon the understanding that the plaintiff was to receive the city bonds at their cash value only, was properly left to the jury. This was a question of fact; and it is certainly impossible to say upon this record that there is not testimony which tends strongly to show that the contract had been changed in this particular by the parties before its execution. It is unnecessary to recapitulate the evidence bearing upon this point. In the twenty-sixth special instruction asked by the defendant and given, the jury were told that even if they should find from the evidence that it was the un-

derstanding of certain members of the harbor committee in 1856 and 1857, during the progress of the work and while payments in bonds were being made, that such bonds were to be received and accounted for by the plaintiff at their market or cash value, and not at par, this would not establish a valid agreement on the part of the city for such a change in the mode of payment. This instruction, together with the second and third instructions given on behalf of the plaintiff, contains, we think, a correct exposition of the law bearing upon this branch of the case.

Again, it is insisted that the circuit court erred in refusing to reduce his charge to the jury to writing, as required by defendant's counsel, and also in addressing the jury orally while charging them in reference to the case and the trial thereof, and particularly in reference to the manner in which the trial had been conducted. As we understand the record, the charge of the court, that is, everything which the court said to the jury to guide them in their examination of the evidence, and which related to any questions of law involved in the case, was reduced to writing before it was given. We do not suppose that remarks of the character of those added orally by the judge, which really have nothing to do with the case—no bearing upon any question of law or fact involved—can be said to be a part of the "charge to the jury," within the meaning of our statute. It is very clear to our minds that what the court may say in regard to the principles of law applicable to the case on trial and the evidence adduced, must be in writing, if requested, because it constitutes the "charge to the jury." But we do not think the remarks made by the judge in this case, as set forth in the bill of exceptions, constitute any part of his charge to the jury. *Patterson vs. Ball*, 19 Wis., 213.

These remarks are sufficient to indicate our views upon the questions involved in this case. We see no error in the record which would authorize a reversal of the judgment.

*By the Court.*—Judgment affirmed.

DOWNER, J., having been of counsel, did not sit in this case.