40    251
Case 2
81     48

## WOODRUFF, AD., v. BERRY ET AL.

1. PUBLIC PRINTING: *Contracts for, must be let in conformity to the statute.*

   Contracts for public printing can be let only in the manner and upon the notice provided by the statute, and if upon opening the bids there is no lowest bid, the board of public contractors must give for another bidding the full notice required by the statute for the first. A contract upon less notice than is required by the statute is unauthorized, in excess of the powers vested in the board, and voidable at the election of the State.

2.  OFFICERS: *By what acts of, the State is bound.*
    The State is not responsible for the mistakes, or unlawful or wrongful acts of her officers or agents.

3.  PUBLIC POLICY: *Combination among bidders to stifle competition.*
    An agreement between several parties that one of them shall bid in his own name at a public sale or the letting of a contract and shall share the profits, is against public policy and voidable, if either the intention, the effect or the necessary tendency of the combination be to stifle or limit competition in the bidding.

APPEAL from *Pulaski* Chancery Court.

Hon. D. W. CARROLL, Chancellor.    ●

*J. M. Moore* and *Compton, Battle & Compton* for Appellant.

No notice of the letting anew was required by the act. The subsequent letting was merely a continuation of the proceedings under the advertisement in the first instance. Thirty days notice, after the rejection of the first bids, could not have been given six months before the expiration of the time for which the contract already existing was let, &c. The board did give 10 days notice. "This was not required by law, but evinces a commendable disposition to give publicity to the" letting. *Acts* 1874-5, *p.* 44, *sec.* 4, *and p.* 46, *sec.* 8-9; *Coxe v. Halstead*, 1 *Green, Ch.* 316; *Richard v. Holmes*, 18 *How.* (*U. S.*), 147; *Allen v. Cole*, 1 *Stockton*, 286; *Suther v. McMichael*, 6 *Humph.*, 298; *Burd v. Dansdale*, 2 *Bin.;* (*Pa*)., 80; *Rupell v. Richards*, 11 *Me.*, 371; *Corriell v. Horn*, 4 *G. Greene*, 455; 5 *Johns.*, 345.

The burden of proving a combination to stifle competition, &c., was upon appellees, and there is no proof of such.

An agreement between two or more, that one shall bid for a public contract, and to divide profits and losses, &c., is not fraudulent unless it is *made for the purpose and with the view* of preventing fair competition, and by reason of want of bidders to secure the contract at prices or on

terms above what is fair and reasonable. *Phippen v. Stickney*, 3 *Met.* (*Mass.*) 388; *Stewart v. Severance*, 43 *Mo.*, 322; *Wicker v. Happoch*, 6 *Wall*, 97; *Switzer v. Skiles*, 3 *Gilman*, (*Ill.*) 529; *Buckner v. Chambless*, 30 *Ga.*, 652; *Young v. Snyder*, 3 *Grant's Cases*, 151; *Young v. Smith*, 10 *B. Mon.*, 296; *Jenkins v. Trink*, 30 *Cal.*, 589.

Fraud is not presumed, when the contract is on its face consistent with honesty of purpose and fair dealing. It must be clearly proved, &c.   3 *Metc. sup.*; 53 *Mass. sup.*; 6 *Wall, sup.*; *Erb v. Cole, &c.*, 31 *Ark.*, 556; *Hempstead v. Johnston*, 32 *Ib.* 123; *Dardenus v. Hardwicke*, 9 *Ark.*, 452.

Even if there was fraud, which there was not, neither the Board nor the Legislature, who knew all the facts, saw fit to take advantage of the circumstance, but waived it by an election to avoid the contract on a wholly different ground, and the State is bound by that election.

43 *N. Y.*, 147, and 71 *N. Y.*, 527, cited by counsel for appellees are not in point.   In the one case there was no *joint* bid, and in the other gross frauds admitted, etc.

*Moore, Attorney General,* by *C. Bradshaw, Assistant,* for the
    State:

The act *does require publication for thirty days next before awarding the contract.*   See latter clause of Sec's 8 and 9. The entire act must be construed together.   Section 4 prescrides *what* notice is required, viz: *thirty days,* and the only reasonable construction to be put upon the act is tha*t* when the Board proceeds to "*let the contract anew*" the same notice should be given, so that all responsible bidders might bid, &c.

A combination to stifle competition is fraudulent and void where the State repudiates the contract.   *People v. Stevens*, 71 *N. Y.*, 527; *Atcheson v. Mallon*, 43 *N. Y.*, 147;

*Hilton v. Echersley,* 6 *E. & B.,* 64, and cases cited in appellant's brief.

The State not bound by the unlawful or wrongful acts of its officers or agents.  95 *U. S.,* 316; 8 *Wall,* 269; 9 *Wheat,* 720; 11 *Wheat,* 184; 18 *Wall,* 662.

SMITH, J.   The Board of Commissioners to superintend the letting of public contracts, consisting of the Governor, Auditor and Treasurer, advertised for thirty days, that they would down to a certain time, receive sealed proposals for the public printing during the years 1883 and 1884.   The Union Printing Company, the firm of Smithee and Newman, the firm of Mitchell & Bettis, and George Woodruff, submitted separate bids for said printing.   The bids were all rejected, the Board being apparently unable to determine who was the lowest bidder.   This was on the 30th of June, 1882.   They then gave notice for ten days that proposals for printing and printing material would be received until 10 A. M., of July 10th.   Thereupon the above mentioned four bidders entered into an agreement that a bid should be made in the name of George Woodruff, for the joint and equal benefit of them all.   Upon this bid the contract was awarded to him, and on the first of January, 1883, he entered upon the performance of said contract.   He died on the 27th of January, 1883, and letters of administration were granted to the appellant.   On the 21st of February, 1883, the Legislature disaffirmed this contract, assigning for its reason that the statutory notice of the letting had not been given, and directing the Board to relet the contract.   The Board published an advertisement inviting proposals, whereupon the administrator of George Woodruff filed the present bill to restrain the members of the Board from letting said contract anew,

Woodruff, Ad., v. Berry et al.

or otherwise interfering with the plaintiff in the performance of his intestate's contract.

The defences were, 1st., the want of due and legal notice of the letting of the contract, and 2nd, that the combination of persons interested in Woodruff's bid was unlawful and contrary to public policy, tending to stifle fair competition in the bidding and causing loss to the State in the increased cost of the public printing.

The Chancellor denied the writ of injunction and dismissed the bill.

Sec. 15 of Art. XIX, Constitution of 1874, provides that the public printing "shall be performed under contract, to be given to the lowest responsible bidder, below the maximum price and under such regulations as shall be prescribed by law."

1. PUBLIC PRINTING : Contracts for, must be let in conformity to the statute.

The act of Nov. 28, 1874, directs that such contracts shall be let to the lowest responsible bidder for the term of two years, and that notice of the lettings shall be published for thirty days in one or more daily and weekly newspapers printed at the capitol of the State, of most extensive circulation throughout the city and State, at least six months before the expiration of the existing contract, in order that the new contractor may have sufficient time to become fully prepared to enter promptly upon his duties. A maximum rate is established, and any proposal in excess of such rate is not to be entertained. All printing is to be done within the State. Sec's. 3, 4, 10 and 20.

Sec. 1 of the amendatory act of March 17, 1879, enjoined it upon the board to contract for lower rates than the maximum, if possible, and authorized them to reject each and every bid, if they deemed them too high and to let the contract anew.

The end proposed in the constitutional provision re-

quiring public contracts to be let to the lowest bidder is public economy. And the means provided by the Legislature is an extended notice in the public journals so as to ensure publicity and secure competition. The established policy of the State upon this subject is, that public contracts are to be let upon public notice, and to be open to competition upon proposals and are to be made with the lowest bidder who can give due security. The entire authority of the board to let such contracts is conferred by statute, and the statute prescribes how only they can contract. Any other contract is unauthorized, in excess of the powers vested in the board and voidable at the election of the State. *Dickinson v. Poughkeepsie,* 75 *N. Y.,* 65; *Kneeland v. Milwaukee,* 18 *Wis.,* 411; *Wells v. Burnham,* 20 *Id.,* 112.

2. OFFICERS: By what acts of the State is bound.

In *Woodward v. Commissioner State Lands,* 39 *Ark.,* we held in effect that individuals as well as Courts must take notice of the extent of authority conferred by law upon persons acting in an official capacity. It is better that an individual should occasionally suffer from the mistakes of public officers or agents than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment or injury of the public. *Mayor v. Eschback,* 17 *Md.,* 282; *Whiteside v. United States,* 93 *U. S.,* 257; *Hawkins v. United States,* 96 *U. S.* 689.

Now if the board had assumed to let this contract without any public notice whatever, it is obvious that they would not have pursued their statutory powers, but would have exceeded the same. *Maxwell v. Stanislaus County,* 53 *Cal.,* 389.

But the argument is, that having once given thirty days notice of the letting and having rejected all bids that were presented in response to the invitation, they were at liberty to invite further bids until a future day

certain, dispensing with further notice or giving a shorter notice than the statute required; and their action in soliciting proposals to the 10th of July was a continuation of the former proceedings, like the adjournment or postponement of a Sheriff's or Master's sale.

All of the cases on this head cited by appellant are cases either of execution or of judicial sales. To prevent the sacrifice of property at forced sales, the officer is invested with a pretty large discretion and in the exercise of that discretion, may adjourn the sale. And as to the character of the notice to be given of the time to which the adjournment is made, the weight of authority is that notice may be given by proclamation made in the presence and hearing of the people assembled at the time first fixed for the sale. However, several respectable Courts have maintained that a new notice must be given, for the time and in the manner required in the first instance. The cases are collated in *Freeman on Executions, sec.* 288.

But we apprehend that the analogy between such cases and the present one is very imperfect. The defendant in execution may move the Court out of which it issued, to set the sale aside for irregularities that have operated to his prejudice; and perhaps the officer may be liable on his bond for any abuse of his discretion in postponing the sale. In judicial sales, the case is still stronger; for they are conducted by an officer who is subject to the control of the Court and they are never final until the Court sanctions them.

This case is more nearly associated to the case of a sale under a power contained in a mortgage or deed of trust where the instrument itself or a statute of the State requires a certain notice to be given of the execution of the

power. In that case a sale without notice or upon shorter notice than is required by the terms of the deed or statute is absolutely void, conveys no title and does not divest the equity of redemption. *Lawrenee v. Loan and Trust Co.*, 13 *N. Y.*, 200; *Bigler v. Waller*, 14 *Wall*, 297; *Shillaber v. Robinson*, 97 *U. S.*, 68.

In *Mitchell v. Milwaukee*, 18 *Wis.*, 92, the City Charter required that all work for the city should "be let by contract to the lowest bidder and due notice shall be given of the time and place of letting such contract." "Work having been ordered to be done on the street in front of the plaintiff's lot, which was chargeable to the lot, the street commissioner proceeded regularly to let the contract, and it was let to the plaintiff himself, he being the lowest bidder. He bid to do the grading at three cents per cubic yard. At the same time there were other bids put in, one at seven cents, one at fourteen and one at forty-two cents per cubic yard. The plaintiff not having entered upon the work under his contract, in what the commissioners held to be a reasonable time, they relet the contract privately at forty-two cents per yard to the same parties who had previously bid at that price." They supposed that they had this power because the charter provided for the publication of notice to the lot owners to do the work within a reasonable time, before the street commissioners should be authorized to let the work on contract; "and if said work be not done within the time limited in such contract the said commissioners may relet such work without further notice." . This action was brought to restrain the sale of the plaintiff's lot on the assessment for the work done under that contract, on the ground that the assessment was void. The single question presented, so far as its validity is concerned, was whether the commissioners had power to re-

let the contract without further notice. The Court held that the "further notice" dispensed with was notice to the lot owner, and that the commissioners are still bound to give notice to the public of a reletting, and no such notice having been given, the contract itself and the assessment upon the lot for work done under it were void.

In the matter of *John G. Leeds*, 53 *N. Y.*, 400, the law authorized the board of water and sewerage commission-. ers in the city of Brooklyn to let the work of constructing a sewer to the lowest bidder and prohibited them from proceeding with the construction except upon advertisement for proposals. A contract for constructing a sewer had been let in accordance with the statute, and the contractor after performing a portion of the work, abandoned the contract, and the work was completed without advertisement or competition, at an expense considerably exceeding the contract price. It was held, Allen, J., dissenting, upon an application to vacate or reduce the assessment, that a failure to advertise, after such abandonment, was not of itself sufficient to establish that the expense had been illegally incurred. But there the liability of the contractor and his sureties was deemed an adequate indemnity against any additional expense in completing the work.

Upon this branch of the case, we are of the opinion that the same necessity for a legal advertisement existed, after the first bids were rejected, as in the first instance. All the considerations which induced the constitutional convention to require that all public work should be let by contract to the lowest bidder and which induced the Legislature to require due notice of the time and place, are as applicable to a second letting as to the first letting. Competition was equally necessary to protect the inter-

ests of the State in both cases.    The board could no more dispense with notice of the reletting than they could have dispensed with the duty of letting to the lowest reposnsible bidder.    For it cannot be assumed that it was intended to require the work to be let anew to the lowest bidder, and yet require no notice or an insufficient notice of the fact of letting.    *Mitchell v. Milwaukee, supra.*

It follows that the board attempted to exercise their discretion in a matter about which they had no discretion.    Yet the State is not responsible for the mistakes of her officers and agents, nor bound by their unlawful or wrongful acts.    *Gibbons v. U. S.,* 8 *Wall,* 269; *U. S. v. Van Zandt,* 11 *Wheat.,* 184; *U. S. v. Kirkpatrick,* 9 *Id.,* 720; *Jones v. U. S.,* 18 *Wall,* 662; *Hunt v. U. S.,* 95 *U. S.,* 316.

We attach no importance to the suggestion that, after the first bids were rejected, it was then impossible to give thirty days notice and let the contract six months in advance of the expiration of the existing contract.    It was equally impossible to give ten days notice and comply with the letter of the law.    And yet the board advertised for ten days.    This provision was for the convenience and benefit of the contractor, giving him ample time to make his arrangements and preparations for doing the work after the comtract was awarded him.    The act of March 17, 1879, authorizing the board to reject all bids, made this six months period of preparation liable to contraction.    And yet a contractor who submitted a bid, knowing at the time that he must enter upon his duties in less than six months, if his bid was accepted, could not complain.

3. **PUBLIC POLICY: FRAUD: Combination among bidders to stifle competition in bidding.**    Upon the other branch of the case—the question of constructive fraud involved in the combination of these rival printers and the submission of a joint bid upon an agreement that all should participate in the work and share in

Woodruff, Adm'r., v. Berry et at.

the profits—we are aware that Courts tread upon thin
ice when they annul contracts because they contravene,
or are supposed to contravene, considerations of public
policy. That may be an unstable and shifting element.
In *Richardson v. Mellich*, 5 *T. R.*, 599, Best, C. J., said:
"I am not much disposed to yield to arguments of public
policy. I think the Courts of Westminster Hall have
gone much further than they were warranted in going
on questions of policy. They have taken on themselves
sometimes to decide doubtful questions of policy, and
they are always in danger of so doing, because Courts of
law look only at the particular case and have not the
means of bringing before them all those considerations
which enter into the judgment of those who decide on
questions of policy  *   *   *  , I admit that if it can be
clearly put upon the contravention of public policy, the
plaintiff cannot succeed; but it must be unquestionable;
there must be no doubt." Burroughs, J., joined in the
protest of the Chief Justice "against arguing too strong-
ly upon public policy. It is a·very unruly horse and
when once you get astride it, you never know where it
will carry you. It may lead you from the sound law. It
is never argued at all but when other points fail."

In *Hilton v. Eckersley*, 6 *E. & B.*, 47, the Judges differ-
ed in opinion as to what public policy was in the case be-
fore them, and Lord Campbell said: "I enter upon such
considerations with much reluctance and with great ap-
prehension, when I think how different generations of
Judges, and different Judges of the same generation,
have differed in opinion upon questions of political econo-
my and other topics connected with the adjudication of
such cases; and I can not help thinking that where there
is no illegality in bonds and other instruments at com-
mon law, it would have been better that our Courts of

Justice had been required to give effect to them, unless where they are avoided by act of Parliament. By following a different course the boundary between Judge-made law and statute-made law is very difficult to be discovered. But there certainly is a large class of decisions, which will be found collated in the report of the recent Bridgewater case, in the House of Lords, to the effect that if a contract or will is, in the opinion of the Judges before whom it comes in suit, clearly contrary to public policy, so that by giving effect to it the interests of the public would be prejudiced, it is to be adjudged void."

The Bridgewater case was *Egerton v. Earl Brownlow*, reported in 4 *H. L. Cas.*, 1. There the Judges were summoned to answer questions of law, one of which was: Are all or any and which of the several provisos in the will of the Earl of Bridgewater void? On this question they differed in opinion, Baron Parke saying: "This (public policy) is a vague and unsatisfactory term and calculated to lead to uncertainty and error, when applied to the decision of legal rights; it is capable of being understood in different senses; it may and does, in its ordinary sense, mean "political expedience" or that which is best for the common good of the community; and in that sense there may be every variety of opinion, according to the education, habits, talents and dispositions of each person, who is to decide whether an act is against public policy or not. To allow this to be a ground of judicial decision would lead to the greatest uncertainty and confusion.

It is the province of the statesman and not the lawyer to discuss, and of the legislature to determine what is the best for the public good and to provide for it by proper enactments. It is the province of the Judge to ex-

pound the law only; the written from the statutes; the unwritten or common law from the decisions of our predecessors and of our existing courts, from text-writers of acknowledged authority, and from the principles to be clearly deduced from them by sound reason and just inference; not to speculate upon what is the best, in his opinion, for the advantage of the community."

Yet the Lords thought differently, and showed by their judgments that this doctrine of the public good, or the public safety, being the foundation of law, an unlimited number of cases might be cited as directly and distinctly deciding upon contracts and covenants on the avowed broad ground of the public good and on that alone.

Lord Brougham said: "Exceptions have been made to the expression of 'public policy,' and it has been confounded with political policy. * * * Public policy, in relation to this question, is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good, which may be termed the policy of the law, or public policy in relation to the administration of the law."

Amongst these contracts, condemned by the policy of the law, may be mentioned contracts in restraint of trade or marriage, marriage brokage contracts, contracts compounding felonies, and agreements made between two or more persons to avoid or reduce competition at execution or judicial sales. And by analogy the courts have extended the prohibition against the prevention of competition to the case of a Dutch auction, where the biddings are downward; as where land is sold at tax sale to him who will pay the taxes for the smallest quantity

of the land; or where contracts for public supplies or work is let to the lowest bidder.

The courts of New York have uniformly inculcated an elevated morality on this subject. Thus in *Doolin v. Ward*, 6 *Johns*, 194, certain articles were to be sold by auction at the navy yard at Brooklyn, and parties being desirous to purchase, agreed that the plaintiff should not bid against defendant, who should purchase the articles and afterwards divide equally. And it was held the contract was against public policy.

In *Wilbur v. How*, 8 *Johns*, 444, a contract for making a road being set up at auction, the parties agreed that if either bid it off it should be divided between them. One bid it off and refused to give the other a share. The Court held the contract *nudum factum*, and a fraud on the vendor.

In *Thompson v. Davies*, 13 *Johns*, 112, it was decided that an agreement which tended to prevent competition at a sale under execution was contrary to public policy and void. Spencer, J., in delivering the opinion of the Court said: "It has been urged that the plaintiff was not bound to bid on the second execution, and was therefore at liberty to enter into this agreement. That is not the test of the principle. In none of the cases cited was the party bound to bid, but being at liberty to bid, he suffered himself to be bought off in a way which might prevent a fair competition. The abstaining from bidding upon concert and by agreement, under the promise of a benefit for thus abstaining, is the very evil the law intends to repress. A public auction is open to every one; but there must be no combination among persons competent to bid, silencing such bidders, for the tendency to sacrifice the debtor's property is inevitable."

In *Atcheson v Mallon*, 43 *N. Y.*, 147, a board of auditors of a town were by statute authorized to receive sealed proposals for the collection of the taxes, and to award the collection to the person who should propose to collect the same on terms most favorable to the public. Two persons, each sending in distinct proposals, agreed that if the collection should be awarded to either, both should share equally in the profits and contribute equally to the losses. And it was held the contract was against public policy; Folger, J., said: "It is not necessary for the determination of this case to inquire whether the effect of the agreement between the parties was, in fact, detrimental to the town. The true inquiry is, is it the natural tendency of such an agreement to injuriously influence the public interests? The rule is, that agreements which in their necessary operation upon the action of the parties to them tend to restrain their natural rivalry and competition, and thus result to the disadvantage of the public, or of third parties, are against the principles of sound policy and are void. * * The object and policy of the statute was to be achieved only by exciting the rivalry and competition of men seeking this privilege. This competition was to be excited by calling by advertisement for sealed and secret proposals. Each bidder, ignorant of what his rival was about to offer, would be under stimulus to make a bid at the best rate to the town which his judgment would sanction as of profit to himself. * * * Where an agreement is made between bidders to share in the acceptance of the offer of either, it is apparent that the competition must materially slacken. Each of those parties had intended to make a proposal on his own account, and it was after each knew of the other's intention that the agreement between them was proposed

and entered into. Until it can be truthfully said that men's actions will not be affected by a consideration of their self-interest, it cannot be maintained that the parties to this agreement were likely, after it was formed, to be as strong competitors as they were before. Such is the natural effect of agreements of this nature; and it is for this reason and not on account of the natural results upon the public or upon third persons, of particular contracts that they are held void. It is because men, with these agreements in their hands, and relying upon them for their gain, do not act toward the public and third persons as they would without them, under the stimulus of competing opposition."

The New York doctrine has been followed in all its rigor in New Jersey by *Gulick v. Ward*, 5 *Halsted*, 87; in North Carolina by *King v. Winants*, 71 *N. C.*, 469, where two persons agreed not to bid against each other for a government contract, to be given to the lowest bidder, and to share the profits of the contract when given to one of them; in Alabama by *Carrington v. Caller*, 2 *Stew.*, 175, where an association was formed to purchase land at the public sales of the United States at the minimum price fixed by law, with a view to re-sell them at a profit; and by the Supreme Court of Maine in *Gardiner v. Morse*, 25 *Me.*, 140.

The Supreme Court of Ohio, in *Breslin v. Brown*, 24 *Ohio State*, 565, have relaxed the rule somewhat by allowing it to be shown that the agreement for partnership was not intended to influence, and did not in fact, influence the bid of either party. See also *Phippen v. Stickney*, 3 *Metcalf*, 384; *McMinn's Legatees v. Phipps*, 3 *Sneed*, 196; and *Wicker v. Hoppock*, 6 *Wallace*, 97, for the circumstances under which agreements for partnership among bidders may be entered into.

We think all the cases upon this subject will be found to agree in this: that where either the intention, the effect or the necessary tendency of the combination is to stifle or limit competition, it is contrary to public policy, and when discovered will be stamped with marks of disapproval in any court of law or equity.

"But it does not necessarily follow, because one person bids for himself and others, or because two or more persons join their capital for the purpose of making a purchase at such sale, that there has been an unlawful or fraudulent combination. There are occasional instances in which the value of the property sold is so great that but few persons in the neighborhood are possessed of the means requisite for its purchase, and in which competition would be diminished rather than increased by prohibiting the aggregation of capital. Other instances frequently occur in which two or more persons may lawfully unite in making a purchase." *Freeman on Executions, Sec.* 297.

To make a practical application of the principles we have announced to the case in hand: The answer alleges that George Woodruff, to obtain said contract, colluded and confederated with his competitors at the first letting, and entered into an arrangement with them, the the substance of which was that he should put in a bid in his own name for each class of the work to be let, but the contract if awarded to him, should enure to the equal benefit of them all. This allegation we regard as proved by the affidavit of the persons interested in said contract. And we see from an inspection of the exhibits attached to the bill that George Woodruff did submit proposals, slightly below the maximum figures allowed by law, which were accepted by the Board. It was further averred that it was agreed at the same time that the Union Printing Company should

put in a bid at the maximum rates, so as to present the appearance of competition, and show that Woodruff was the lowest bidder. This was a material averment, but there is no proof in the record to sustain it, and we can give it no weight.

But the confederation of bidders being admitted, or established by proof, it devolved upon the plaintiff to show that it was for the joint prosecution of a business enterprise, and not a mere device to shut off or reduce competition. Now they depose that they had no design to get an advantage of the State, or to suppress bidding, by which we suppose they mean bidding by persons outside of the combination. For certainly it could never have been contemplated that these dormant partners should be at liberty to put in independent bids of their own, if they chose. That would have been an act of bad faith to the partnership. Yet they show no other motive for combining except the motive, so obvious that it will be inferred, of getting rid of the competition of each other, by the surrender of each to the other of a portion of the work and anticipated profits. We cannot presume they united for want of means to undertake the entire job, for they had each proposed to do it singly and alone.

Again, the burden of proof was upon the plaintiff to show that the State had received no detriment by their combination. They do indeed swear that the prices at which the contract was awarded to Woodruff were fair. But this is too general. It ought to have appeared that those prices did not greatly exceed the average of what they were willing to undertake the work for singly. Finally it should have been shown that the natural and necessary tendency of the combination was not to reduce the number of bidders. And this we imagine, was in the present case, an impossibility. The combination, so far as we can see, included all the bid-

ders at the first letting. And upon the short notice that was given, it was not likely.that any others would appear. The probable effect of the combination was to reduce the competition to zero, and to allow the persons concerned to dictate the prices to the Board.

The legislature might have ratified this contract; *Hasbrouck v. Milwaukee*, 21 *Wis.*, 217; or have acquiesced in it. But they have repudiated it. And the question is, has the State the right of rescission? For we attach to the act no greater force or effect than an offer to rescind.

The decree of the Chancellor is affirmed.

### SEPARATE OPINION BY

EAKIN, J. The act of the last General Assembly, regarding this contract, can only be considered as an expression of a determination to rescind it. The right of the State to do so is a judicial question, to be determined by the Courts. If it be found that the right has been fairly and properly exercised, in accordance with principles regulating the contracts of individuals; or even if the matter be doubtful, comity requires that the Courts should not interfere with the action of a co-ordinate department of the government in a matter primarily subject to its direction. It is in this view of the case only, that I yield my assent to the decision of the Court sustaining the action of the Chancellor in refusing the injunction. Injunctions are not of positive right. They rest largely in a sound discretion, to be often determined by a nice balancing of the dangers and inconveniences, *pro and con*. There are reasons of public policy which require great delicacy in its exercise, where it might embarrass the ordinary and necessary operations of the government. In such cases the wrong should be clear, and the mischief eminent and irremediable; or the parties should be left to their legal rights. And in all cases where there would be an effective legal remedy against individuals for breach of contract, I

am not sure the equity for an injunction against the State would arise to prevent the action, through her govermental agencies; from the fact that she could not be compelled by the courts to make redress. It is perhaps more in accordance with a just sovereignty to suppose she will herself make all proper compensations. I am not satisfied, however, nor do I deem it necessary, in sustaining the order of the Chancellor, to establish it as a precedent that the letting of the contract was clearly voidable at the will of the General Assembly, upon either of the grounds disclosed by the transscript. If it were presented as a legal question to be authoritatively decided, and not as the ground for an injunction addressed to the sound discretion of a Chancellor, I would hesitate to say that there was such want or defect of notice of the biddings as should deprive the contractors of the benefits of the contract, after they had given bond, made expensive preparations and partly performed the work. All the notice had been given by the first advertisment which the policy of the act required. It is the general rule, on all sides conceded, that public *sales* may be postponed to another day, if from any cause the sale on the appointed day be prevented, provided sufficient notice of the future day be then and there given; and the original advertisement, if well made, will suffice. The authorities on this point, as shown by brief of appellant's counsel, are numerous. It is difficult to see any difference, in principles, between sales by authority of law and the letting of public contracts.

It is true that in the case in judgment there was no suspension in action and formal postponement. All the bids were rejected, and proceedings by advertisment begun *ab initio*. There was no express warranty for that, nor was there any express prohibition, but there was general authority to "let anew," and there is no room to doubt that all the bidders were at the time, advised of the action of the Board

It was not prescribed what advertisement should be given in such contingency, or that any should. The original notice and advertisment required by law had already been given, and had served all the beneficial purpose of inviting competition. Every bidder had the privilege of keeping his bid *in statu,* by renewing it, or of altering his bid to be more acceptable. The State had all that benefit, with the additional advantage of an increased competition. The contract awarded was at fair prices. So much is shown. This cannot, except in mere form, be distinguished from a case of postponement. The State had every chance of advantage, and is not shown to have been injured. Nor, independently of motives prompting caution, in the issuance of an injunction (to thwart the express directions of the General Assembly contained in a solemn act), would I be prepared to hold as a governing principle, that a combination of individuals to bid jointly in the name of one for a public contract, if made openly, frankly, and for honest purposes of their own profit and convenience, without any artifice to suppress competition in others, is so much against public policy as to render the contract voidable, at the arbitrary will of the other party, without the proof of some detriment or loss. There are some cases which seem to go to that extent, especially in the State of New York; but there are many *per contra,* in other States, especially in the States of Massachusetts and New Hampshire. It seems to me the latter cases are based upon sounder and higher views of public policy, individual liberty, and the requirements of modern enterprise. Business has undergone great changes in its modes and appliances within the last hundred years. The magnitude and difficulties of modern works require aggregation of individual means; and it may be that the greater facilities for their accomplishment, thus afforded, may enable companies and associations to undertake them at

lower rates. A rule which would exclude such combinations, compelling individuals to compete with each other, would not only be an invasion of individual rights, but very questionable policy. I imagine the true and rational inquiry to be this: Not whether two or more agreed that one should bid for the common benefit, but was the association for honest and just purposes, free of fraud, without any artifice, concealment or practice to suppress competition on the part of others? and for the purpose of enabling two members to do jointly what they could not so well do separately?, If so, it should certainly be upheld. Such is the view of Mr. Story in his work on contracts. (Sec. 548, citing the authorities).

As this case stands upon the proof in the transcript, leaving out of view the unsupported allegations of the answer, I must confess I see nothing in the agreement of a fraudulent character or that militates against a sound public policy. Four firms, or offices, had bidden separately. None had been accepted. Not because they were, so far as appears, any of them unfair, but because the Board could not determine which was lowest. They then openly, without any concealment, with full knowledge of the board, as appears in proof, settled amongst themselves a tariff of rates upon which they could all agree, and put it in jointly, but in the name of one. This bid was open to competition by all the printers in the State, who had bid or might wish to come in on the extended time. We cannot presume there were no others. There is nothing to show that these contractors used any artifice, practice or means whatever; or meant to suppress such competition. I am not clear that this, and this as yet is all we can see, was against public policy. The General Assembly did not make any complaint of the contract as fraudulent or unfair, or impolitic; nor did the Chancellor make that any ground of his

Woodruff, Ad., v. Berry et al.

decision.   If it is to be considered of importance, in refusing the injunction, I think the case should be remanded.

Whether the Attorney General might be able by proof, to sustain his allegations in full, I cannot foretell.   The case went off below on another point, which being settled dispensed with proof as to fraud or improper practice.   It would be well, being a public matter and peculiar, to remand it for further proof as to fraud.   Nevertheless, as my associates do not share these views, but think the Chancellor right in refusing the injunction upon the case as made, I do not, for the reasons first stated, refuse my assent.